Curia, per
Earle, J.
Although the first ground taken in the notice of appeal does not present the precise question made in the argument, nor cover the whole ground occupied by the counsel, yet enough is collected from the report of the Judge and the admissions of the bar to authorize the Court to consider and decide :
1st. Whether the plaintiffs’s counsel should have been allowed to cross examine the witness Dawkins, as to former declarations made by him inconsistent with his oath in court, and then, to call witnesses to prove those declarations.
2nd. Whether, after that evidence had been allowed, the-other party, or the witness himself, should not have been permitted to sustain his oath in court, by proof of general good character.
*43 The rules of evidente are generally well settled. They are the result of experience, and are framed for the purpose of eliciting truth in the most effectual manner, but also with a view to protect the witness from unnecessary assault. To secure parties from the consequences of falsehood, as well as to advance the ends of justice, it is necessary and proper that they should be allowed to attack the credibility of a witness called to testify against them; and there are three modes of doing this: 1st. by proof through other witnesses that the facts are otherwise; 2nd. by evidence of general bad character, which would render him unworthy of credit; or, 3rd. as Mr. Phillipps expresses it, (1 Phil. Ev. ch. 8,) “by proof that he has made statements out of court, on the same subject, contrary to what he swears at the trial.”
As to the first of these modes, it is obvious that it may be resorted to without in the slightest degree impugning the veracity of the witness, so long as men view the- same transaction in different lights, form different conclusions from the same premises, pay more or less attention to the same occurrences taking place before their eyes, and have memories more or less retentive. A party must be allowed to shew by witnesses called by himself, that facts are otherwise than as they are deposed by the witnesses called against him; and this, too, without being understood as so attacking the character of those adverse witnesses, as to let in evidence of general good character in reply. But it seems impossible to resort to either of the other modes without making a direct attack on the veracity and character of the witness. The proposition is direct, that he is unworthy of belief; from general infamy, in the one case, and in the other, that he either swears falsely on the trial, or was guilty of falsehood before. Such proof of former inconsistent declarations is always offered to discredit what the witness swears on the trial, and is held to be one of the most legitimate modes of doing so, as it is in fact one of the most common.
*44 But, although this is perfectly reasonable and proper in regard to an adverse witness, it becomes another question when presented in regard to a party’s own witness. The rule is universal, and founded in the strongest common sense and most rigid justice, that a party shall not be allowed to discredit his own witness, that is, to shew that his witness is not worthy of belief; and this is a rule which seems to be indispensable, not so much for the protection of the adverse party as of the witness himself. “ It would,” says Mr. Justice Buller, (N. P. 297,) “ enable the party to destroy the witness if he spoke against him, and to make him a good witness if he spoke for him, with the means in his hand of destroying his credit if he spoke against him.”.
It is true the meaning of this rule is restricted by Mr. Phillipps to proof of such general bad character as would make him unworthy of credit, (1 Phil. Ev. 213, ch. 8,) and this view receives some countenance from the court in Perry vs. Massey, (1 Bailey, 32,) but the position is not sustained by any of the cases. No doubt when a party calls a witness who swears differently from what was expected, he is not precluded from relying on other proof by other witnesses that the fact is not as his first witness deposed, although this may indirectly have the effect of bringing in question the credit of such witness ; and he may, perhaps, resort to the previous admissions of the same witness, provided such admissions would, of themselves, have been competent evidence of the fact, independently of the personal bearing of the examination. Such was clearly the case of Alexander vs. Gibson, before Lord Ellenborough, (2 Camp. R. 556 ;) and, in Perry vs. Massey, the admissibility of the evidence of previous contradictory acknowledgements was rested, by the counsel who offered it, on the very ground that “ Weaver’s agency was established, and his acknowledgement of payment was evidence in the cause, independently of any purpose to impeach Weaver’s credit.” It would be extremely harsh to allow a party calling a witness to go farther.
*45 It seems in vain for counsel to disclaim the intention of impeaching the credit of Dawkins. He appeared to be a subscribing witness to the will. He was called to disprove the due execution of the will, or with the expectation that he would do so. He deposed differently, and proved the will to have been duly executed. The party who had called him had then a right, surely, to call other witnesses and prove the fact of non execution, or to make it appear in any other way by evidence that was originally competent. But here, counsel were allowed to prove that Dawkins had on several occasions made inconsistent statements; and, to open the way to this proof, as in the case of impeaching the credit of an adverse witness, he interrogated the witness himself, concerning these statements. It is enough to determine this question to ask whether the declarations of Dawkins out of court, would have been competent in the first instance, or whether, after they were admitted, they were competent as independent proof. Certainly not. They could therefore serve no other purpose than to throw suspicion and discredit on the evidence of Dawkins, delivered at the trial. They were to shew that his oath then was not entitled to credit, by convicting him of falsehood upon his former declarations.
Nor is it a sufficient answer to this reasoning, that the objection was waived by the adverse counsel. The rule is intended for the protection of the witness, and should not have been violated, even with the consent of the counsel.
If Dawkins had been the witness of the other party, and his testimony had been impeached as it was here, I think he should have been allowed to call witnesses to prove his good character. Such evidence, in its direct tendency, is calculated to shew that the witness is not worthy of credit. It is an assertion of his having spoken or sworn falsely, and his good character is a legitimate defence against the presumption that is raised against him. In Rex vs. Clarke, (2 Stark. R. 214,) before Holroyd, J. such evidence was allowed. There, the *46 character of the witness for the prosecution was impeached on her cross-examination, as to her conduct and deportment, and she was permitted to call witnesses to her good character. “ Since,” said Holroyd, J. “the object of the cross-examination was to impeach the character of the witness, and to shew that she was not credible. I do not see why such evidence may not be let in for the purpose of removing the impeachment of her character upon cross-examination, as well as if it had arisen aliunde”
Nor can it make any, difference that the witness was called by the party impeaching him. If the protection he was en-. titled to was withheld from him, it was due to him as a personal right to be permitted to sustain himself.
Independently of these errors in law, the Court is of opinion that this verdict ought not to stand; that it is not only opposed to the great preponderance of evidence, but that there is, in fact, in the whole report of the case, no proof of such undue and improper influence as should be allowed to invalidate a will. This phrase of undue influence, so frequently resorted to in this country, by disappointed relations, to avoid wills of persons on whom, while living, they had no claims, seems to me to be a modern innovation, and is not known in the English Courts, Every person of reasonable mind and sane memory may dispose of his property by will. It is a right secured by the municipal law, and exists in as perfect form as the right to tranfer by sale or gift during life. The true inquiry always is, whether there exists the animus testandi ; for, without that, the instrument purporting to be a will is of no effect in law. The party, therefore, must be free, and under no compulsion from such threat or violence as may reasonably be supposed to move a constant man. Even in case of such constraint or fear, if, when they are over, the testator confirms the will, it is made good. So likewise, wills procured to be made by artful misrepresentations and fraudulent contrivances, are void. But it is not unlawful for *47 a man, by honest intercessions and modest persuasions,- to procure a will to be made in his behalf; and, according to the ecclesiastical law, importunity, in its legal acceptation, must be such as the testator is too weak to resist, and pressed upon him even to such a degree as to take away his free agency. These are the general rules on this subject; and, if they be applied to the case made by the proof, it will be very difficult to find the evidence either of threat, or violence, of fear, or compulsion, or artful misrepresentation, or fraudulent contrivance, of immodest flattery joined , unto deceit, or of excessive importunity, extorting from the feebleness of age or disease, what it was unwilling to grant, yet unable to withhold.
The testator was an intelligent man, of strong mind, not yet greatly advanced in years, and only impaired in the vigour of his understanding by intemperance. He had no lawful wife, nor children, and had not lived in amity, at least not in continued amity, with his relations; and he has given his property to a stranger to his blood. This he surely had a right to do, and this is all that appears upon the face of the will.
When the executor and sole legatee proposes to produce the paper which contains the trusts, it is excluded, even by those who, in the argument to the jury, and to this Court, have urged that the will had ulterior and unworthy objects, and was made under the undue influence of a slave. We cannot, however, avoid seeing, through the face of the will, that the purpose was to provide a mode of bestowing the property on the issue of an illicit intercourse between that slave and himself. We do not choose here to speak of the indecency of such a connection, nor of the policy of permitting property to be given or devised in trust for the benefit of such persons. Until the Legislature thinks fit to interfere, we must have questions of this sort determined by the established rules of law.
*48 Now, what facts, if proved, shall constitute undue or improper influence to avoid a will, I hold to be a question of law; and I think, in cases of this kind, the particular sort of influence should be set down in the pleadings. That the testator was to a considerable extent under the influence of the woman in his domestic arrangements, is undeniable — as much, said one witness, as a man usually is under the influence of his lawful wife; yet it would not hold either with reason or law, to say that such an influence would avoid a will in behalf of the wife. Testator and the woman often quarrelled ; she threatened to knock his teeth down his throat, cursed him for an old palsied rascal, rubbed her fist in his face, and dared him to open his mouth. These occurrences were during the paroxysms of mutual drunkenness, and really seem to be any thing but flattering speeches, or deceitful representations, or excessive importunity, used for the purpose of procuring a will to be made in behalf of her son. Indeed, all the proof of this kind referred to the year 1835, while the fact was that, as early as 1828, the testator had made a disposition of his property for precisely the same purpose, only appointing another executor. And this disposition of it was in conformity with the uniform tenor of his declarations from that period to the time of making the will under consideration. A disposition of property, though ever so capricious or unreasonable, will not be avoided on that ground alone. It is no lawful objection to a will that it does not dispense the testator’s property to his relations, especially remote ones, unless deceitful arts have been used to estrange fixed affections. There is nothing of that kind here, and, however indecent and degrading was the connection of the testator with his slave, yet as he had issue by her, whose appearance seemed such as to secure him a status in society in another State, which he could not gain here, it is not perceived that there was any thing unreasonable or unworthy in making such a disposition of his property as to promote that end.
*49 After all, whatever sort of influence is alledged, to avoid a will, must appear to have been exerted for the purpose of procuring it to be made. Now there is not in this case any proof, except by Ellen Brock, that the woman Fan had any direct communication with the testator, on the subject of the mode of bestowing his property. “ She said, before any of the Farrs should have any of the property, she would lose her life.” This was in 1835, and, besides that the will in Judge O’Neall’s hands was then made, it was no threat of violence to the testator to put him in fear: it was not the exercise of any of the arts alluded to, which may avoid a will; but only a strong expression of her dislike, and even that was after an expression of the testator’s intention in her favour, proved by the same witness.
Upon the whole, the Court is of opinion, notwithstanding the learned and able argument of the counsel for the appel-lees, that to allow this verdict to stand would be, to let the jury run wild under the influence of prejudices and feelings which, however honorable and praiseworthy, must not be permitted to overthrow the rules of law, or divert the current of justice. The trial by jury would otherwise become an engine of capricious injustice, instead of the safe-guard of property. The motion for new trial is granted, with the unanimous consent of the Court.
O’Neall, J. declined expressing an opinion in this case.
Thomson 8$ Dawkins for the motion; Herndon 8$ Henry, contra.